UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

NORTHERN DIVISION

FILED

MAR 0 1 2006

**********************************************************************

| | | |
|---|---|---|
| S&S COMMUNICATIONS, | * | CIV 02-1028 |
| | * | |
| Plaintiff, | * | |
| | * | OPINION AND ORDER ON |
| -vs- | * | DEFENDANTS' MOTION FOR |
| | * | SUMMARY JUDGMENT |
| LOCAL EXCHANGE CARRIERS | * | |
| ASSOCIATION, INC., et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

**********************************************************************

## INTRODUCTION

Plaintiff filed this action against the Local Exchange Carriers Association, Inc. ("LECA"), Express Communications ("Express"), and 28 member rural local telephone exchange carriers ("LECs"). Plaintiff claims that the individual local telephone carriers, acting on their own and through the two entities, are conspiring to monopolize the intrastate long distance carrier market in South Dakota through predatory price fixing, amounting to a restraint of trade, resulting in the limitation and elimination of plaintiff's ability to offer intrastate long distance service in South Dakota.

Plaintiff was a long-distance company (also referred to in the record as an interexchange carrier or IXC) that provided both intrastate and interstate long distance service to subscribers in South Dakota. Long distance carriers must pay both the originating local telephone company (the company operating the telephone system for the person making the long-distance call) and the terminating local telephone company (the company operating the telephone system for the person receiving the long-distance call) a "switched access" fee (called a "tariff"). The 2002 tariffs at issue were set by the South Dakota Public Utilities Commission ("PUC") at approximately $.09/minute for originating access and $.11/minute for terminating access. In addition, the long-distance carrier must pay a per minute centralized equal access service fee to

SDN Communications[1] ("SDN") which owns and operates the tandem switch facility. SDN is a corporation owned and operated by the defendant LECs. The tariff charged by SDN is also set by the PUC. In 2002, it cost long distance carriers roughly $.2045 per minute to transport a customer's intrastate long distance call.

Defendant LECA is an association formed and owned by the 27 defendant LECs for the purpose of filing a joint tariff request with the PUC to establish a uniform rate for switched access. The purpose of LECA is to assure that all rural areas of South Dakota receive long-distance service even though the cost of providing switched access long-distance service varies according to population density and distribution. In addition to its joint tariff function, LECA also pools its members' switched access revenue, which will be more fully explained below. There are a handful of LECs that are not members of LECA and the PUC has established separate tariffs for those non-members.

Defendant Express is a long-distance carrier created and owned by defendant LECs for the purpose of arranging the transport of their customers' long-distance calls. Express is merely a "paper" entity in that it does not have its own physical plant, switches, buildings, or staff. For the most part, it does not market long-distance service. Its primary purpose is to contract with MCI (and, to an insignificant extent, other long distance carriers) to carry the major portion of the LECs customers' long-distance calls where the customer has chosen their local telephone company as their long-distance carrier. Express is not designed to make a profit.

SDN was created in the late 1980's to provide centralized equal access for South Dakota's independent telephone companies. SDN's existence means that the LEC members do not each have to maintain their own switch to route their customers' calls. The 27 members of LECA are also the owners of SDN.

Plaintiff alleges that, although it costs over $.20/minute for a long-distance carrier to provide long-distance service in South Dakota, the LECs marketed their long-distance services for significantly less. Plaintiff contends that this is evidence that the LECs are not paying each other the switched access tariff, allowing them to obtain a monopoly of long-distance services in

---

[1]SDN Communications is not a party to this litigation.

South Dakota.  Plaintiff further contends that the LECs have entered into an agreement to use only Express to carry (and that term is used loosely because in actuality Express does not "carry" anything; it contracts with MCI and other companies to carry long-distance calls) their customers' long-distance calls, to the exclusion of plaintiff.  The result is that a significant portion of long-distance traffic in South Dakota is physically handled by MCI.  MCI, it is alleged, is able to give defendant LECs a very competitive price for the use of its long-distance lines, a price that is lower than what plaintiff was able to negotiate with MCI for the use of MCI lines.  Finally, plaintiff contends that it was denied membership in LECA and the benefits accruing thereunder, including a favorable rate from MCI and others to carry long distance calls for its customers.

Plaintiff contends that defendants' conduct amounts to a restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1 (Count I), predatory price fixing in violation of the Sherman Act, 15 U.S.C. § 2 (Count II), a restraint of trade in violation of SDCL 37-1-3.1 (Count VI), a monopoly in violation of SDCL 37-1-3.2 (Count VII), and a civil conspiracy (Count IX).  The Court previously dismissed plaintiff's discriminatory pricing claim under 15 U.S.C. § 13 (Count III) based upon the primary jurisdiction doctrine.  Plaintiff has, in its responsive brief (Doc. 151), abandoned its claims that defendants' conduct (1) violated the Telecommunications Act, 47 U.S.C. § 202 (Count IV), (2) amounted to price discrimination in violation of SDCL 41-39-11 (Count V), and (3) constituted deceptive trade practices in violation of SDCL 37-24-6 (Count VIII).

Defendants have filed a motion (Doc. 144) for summary judgment, contending that plaintiff's antitrust action fails based upon the state action exemption, that plaintiff has no valid or admissible expert testimony establishing the definition of the relevant market or dominant market share as required in a Sherman Act claim, and that there is no evidence of a conspiracy or any injury or damages.

## DISCUSSION

The summary judgment standard is well known and has been set forth by this court in numerous opinions.  *See* Hanson v. North Star Mutual Insurance Co., 1999 DSD 34 ¶ 8, 71 F.Supp.2d 1007, 1009-1010 (D.S.D. 1999), Gardner v. Trip County, 1998 DSD 38 ¶ 8, 66

F.Supp.2d 1094, 1098 (D.S.D. 1998), <u>Patterson Farm, Inc. v. City of Britton</u>, 1998 DSD 34 ¶ 7,

22 F.Supp.2d 1085, 1088-89 (D.S.D. 1998), and <u>Smith v. Horton Industries</u>, 1998 DSD 26 ¶ 2,

17 F.Supp.2d 1094, 1095 (D.S.D. 1998).  Summary judgment is proper where there is no genuine

issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(c); <u>Donaho v. FMC Corp.</u>, 74 F.3d 894, 898 (8th Cir. 1996).  The United States

Supreme Court has held that:

> The plain language of Rule 56(c) mandates the entry of summary judgment . . .
> against a party who fails to make a showing sufficient to establish the existence of
> an element essential to that party's case, and on which that party will bear the
> burden of proof at trial.  In such a situation, there can be "no genuine issue as to
> any material fact," since a complete failure of proof concerning an essential
> element of the non-moving party's case necessarily renders all other facts
> immaterial.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

"A material fact dispute is genuine if the evidence is sufficient to allow a reasonable jury to

return a verdict for the non-moving party."  <u>Landon v. Northwest Airlines, Inc.</u>, 72 F.3d 620, 634

(8th Cir. 1995).  "[T]he burden on the moving party may be discharged by 'showing'--that is,

pointing out to the district court--that there is an absence of evidence to support the nonmoving

party's case."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 325, 106 S.Ct. at 2554.  Rule 56(e) "requires

the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'"  <u>Id</u>. at 324, 106 S.Ct. at 2553.  In considering the

motion for summary judgment, this Court must view the facts in the light most favorable to

plaintiff and give plaintiff the benefit of all reasonable inferences that can be drawn from the

facts.  <u>Donaho</u>, 74 F.3d at 897-98.

    The undisputed evidence presented by the parties shows that when a customer of a local

telephone company (in Brookings, South Dakota, for example) picks up the telephone and dials

an intrastate long distance call (to Clear Lake, South Dakota, for example), the call goes to the

originating local telephone company's (City of Brookings Municipal Telephone Department)

switch.  The switch recognizes the call as long distance and the call is routed to the centralized

equal access switch at SDN in Sioux Falls, South Dakota.  SDN's switch recognizes who the

customer has as a long distance carrier (MCI, for example) and "dumps" the call onto that carrier's trunk. It is unclear what the long distance carrier does with the call but the call is eventually delivered back into the SDN switch by the long distance carrier. The long distance carrier then delivers the call to the terminating local telephone company's (Interstate Telecommunications Cooperative ("ITC") in Clear Lake in this example) local switch. The terminating local carrier delivers the call to the intended customer.

The long distance carrier pays the originating switched access tariff (to the City of Brookings Municipal Telephone Department in the example above), the equal access switching tariff (to SDN), and the terminating switched access tariff (to ITC, in the above example). SDN bills the long distance carrier the equal access switching tariff for the use of SDN's switch. The originating and terminating LECs bill the long distance carrier for the originating and terminating switched access tariff and the long distance carrier pays the appropriate LEC based upon those bills.

Each of the LECs market intrastate[2] long distance service to their own local customers (although it is alleged that they do not market intrastate long distance service to any other LECs' customers). A customer of the City of Faith Telephone Company could choose to have long distance service provided by Faith Long Distance or that customer could choose to have long distance services provided by any number of other IXCs, including MCI, Sprint, AT&T, Qwest and, before July of 2003, S&S Communications. The LEC is a "dual service provider" where the LEC is both the local and long distance telephone service provider for the customer.

The LECs do not, and could not in an economically feasible manner, own or operate fiber optic telephone lines to SDN's switch and out to all the other LECs in South Dakota. LECA's members contract with Express to "carry" their customers' long distance calls when the LEC is a customer's dual service provider. Express in turn contracts with MCI, Sprint, and other national carriers, to have them physically carry the calls. MCI handles 99% of the Express traffic. MCI bills Express, on a monthly basis, long distance charges based upon the number of intrastate long distance minutes used by the dual service providers (or, more correctly, used by their customers).

---

[2]The LECs do not market interstate long distance, except to the extent that they are a border LEC with local telephone service customers in a bordering state.

5

Express aggregates those charges and then bills the dual service provider LECs a blended per minute rate for the minutes used by each LEC.  Express essentially breaks even.  The LECs pay, in effect, an averaged per minute charge for the use of the long distance carrier's lines.

The 27 LEC defendants have historically had approximately 20% and no more than 30% of the intrastate long distance market in South Dakota.  The LEC defendants charged their local customers as low as $.10 per minute for intrastate long distance service.  The national carriers have offered intrastate long distance services in South Dakota during the relevant time period for as low as $.05 per minute.

## I.  State Action Exemption.

The doctrine of state action anti-trust immunity was articulated in <u>Parker v. Brown</u>, 317 U.S. 341, 352, 63 S.Ct. 307, 314, 87 L.Ed. 315 (1943), wherein the United States Supreme Court held that the Sherman Act prohibits only individual action and does not prohibit restraints on competition imposed by a state.  "The <u>Parker</u> decision rested on basic principles of federalism.  The Court determined that neither the express language nor the legislative history of the Sherman Act evidenced an intention on the part of Congress to restrain state action."  <u>Central Iowa Refuse Systems, Inc. v. Des Moines Metropolitan Solid Waste Agency</u>, 715 F.2d 419, 423 (8th Cir. 1983).

The test for protection under the state action doctrine comprises two factors:

> First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy"; second, the policy must be "actively supervised" by the State itself.

<u>Healthcare Equalization Committee of the Iowa Chiropractic Society v. Iowa Medical Society</u>, 851 F.2d 1020, 1024 (8th Cir. 1988) (<i>quoting</i> <u>California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.</u>, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980) ("<u>Midcal</u>") and <u>City of Lafayette v. Louisiana Power & Light Co.</u>, 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 l.Ed.2d 364 (1978)).

Defendant carriers contend that their association together under the LECA umbrella and their activities thereunder are exempt from anti-trust constraints under the state action doctrine because those activities were authorized by SDCL 49-31-59.1.  That statute provides, in part, that:

> It is the intent of the Legislature to encourage telecommunications companies to more efficiently meet the infrastructure deployment goal described in §§ 49-31-60 and 49-31-61 for a fully integrated SONET backbone of interconnected survivable rings. To that end, telecommunications companies may jointly provide facilities and enter into revenue-pooling arrangements between and among themselves relating to the provisioning of these facilities. Any such arrangement shall be subject to commission review and approval and, to the extent it has received such approval, may not be construed as violating any state or local laws governing unfair trade practices, antitrust or restraint of trade. Further, it is the intent of the Legislature that any such approved arrangement shall be exempt from federal laws governing unfair trade practices, antitrust, and restraint of trade.

SL 1998, Ch 274, § 27. Clearly, there is an expressed state policy favoring revenue pooling arrangements among telecommunications companies in South Dakota. However, nowhere in SDCL 49-31-59.1, nor anywhere else in the South Dakota Codified Laws or administrative rules pointed out by defendants or found by this court, does the state legislature express a state policy of restraining trade in such a way that long distance carriers cannot be admitted to such a revenue pooling arrangement. It is not the revenue pooling arrangement about which plaintiff complains but, rather, defendants' refusal to allow plaintiff to participate in such arrangement. It is rather curious that plaintiff claims to have been prevented from joining what it claims is an organization violating federal law. Plaintiff further complains that those LECs involved in LECA's revenue pooling arrangement are violating federal antitrust law by not charging each other tariffs imposed by state law. There is no expressed state policy exempting such alleged activities from antitrust rules.

In any event, defendants' state action exemption claim also fails part two of the Midcal test. South Dakota's policy of allowing telecommunications companies to enter into revenue pooling agreements is not "actively supervised" by the state. It is true that the Public Utilities Commission ("PUC") determines the tariffs to be charged for various services provided by LECs to IXCs. The PUC also determines the tariffs to be charged when a group of LECs associate and petition for joint tariffs. However, the United States Supreme Court has never applied the state action exemption where the state merely sets the price or tariff to be charged.

7

The "state action exemption" held applicable in Parker v. Brown, *supra*, upheld price supports for raisins imposed by the California Agricultural Prorate Act which restricted competition among the growers. *Id*. at 346, 63 S.Ct. at 311. The Act authorized the creation of an Agricultural Prorate Advisory Commission, which commission dictated in detail the marketing of California raisins. *Id*. The prorate program "derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command." Parker v. Brown, 317 U.S. at 350, 63 S.Ct. at 313. The Commission was a state agency whose actions were directed by the state legislature. *Id*. The South Dakota PUC is likewise a state agency that derives its authority from the legislature. However, LECA and its members are not a state agency. Although LECA and its members are authorized by the PUC to conduct business and to form a revenue pooling association, the PUC is not actively involved in the operation of LECA.

The United States Supreme Court declined to immunize California's statutorily created wine-pricing program which constituted resale price maintenance in Midcal because:

> The State neither establishes prices nor reviews the reasonableness of the price schedules; . . . [t]he State does not monitor marked conditions or engage in any "pointed reexamination" of the program.

Midcal, 445 U.S. at 105-06, 100 S.Ct. at 943. This case presents more active state supervision than was present in Midcal because here the PUC actually held hearings to determine whether the tariffs proposed by LECA were fair and competitive.

This case is like Cantor v. Detroit Edison Co., 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed. 2d 1141 (1976), where Detroit Edison distributed electric light bulbs to its electric customers free of charge, essentially preventing competition from competing light bulb distributors who needed to charge customers for light bulbs. Detroit Edison's rates, including the omission of any separate charge for bulbs, were approved by the Michigan Public Service Commission. Detroit Edison could not change its rates or abandon the free light bulb exchange program without the Commission's approval. However, the option to have the light bulb exchange program was Detroit Edison's. The Supreme Court held that, since Detroit Edison was not obligated to have such a program, it would not be unfair to hold it, a private party, responsible to conform to federal antitrust law. Cantor v. Detroit Edison Co., 428 U.S. at 594-95, 96 S.Ct. at 3119.

LECA is not compelled by state law to be allegedly anticompetitive by refusing membership to plaintiff. LECA's freedom of choice in excluding plaintiff ostensibly because plaintiff is an IXC rather than an LEC is an important factor in determining whether LECA is entitled to state action immunity. Cantor, 428 U.S. at 593, 96 S.Ct.. at 3118. Id. at 593, 96 S.Ct. at 3119. Even if LECA were compelled by the PUC to refuse membership to plaintiff, "state authorization, approval, encouragement, or participation in restrictive private conduct confers no antitrust immunity." Cantor, 428 U.S. at 592-93, 96 S.Ct.. at 3118 (footnotes omitted).

The Supreme Court held in Goldfarb v. Virginia State Bar, 421 U.S. 773, 791, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975), that "[i]t is not enough that . . . anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign." The state action exemption "does not mean, of course, that the States may exempt private action from the scope of the Sherman Act; we in no way qualify the well-established principle that 'a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful.'" City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 379, 111 S.Ct. 1344, 1353, 113 L.Ed.2d 382 (1991) (quoting Parker, 317 U.S., at 351, 63 S.Ct., at 314).

Although South Dakota law authorizes telecommunications companies to form an association for the purpose of proposing joint tariffs and authorizes revenue pooling arrangements, state law does not compel such associations to refuse to deal with a telecommunications company seeking to obtain the benefit of such a revenue pooling arrangement. South Dakota does not compel refusal to deal. Defendants have failed to point to any continuing supervision by the PUC over LECA's revenue pooling arrangement. Defendants do not qualify for antitrust immunity under the state action exemption doctrine.

## II. Restraint of Trade.

Plaintiff contends that defendants' conduct, including LECA's "refusal to deal," amounts to an unlawful restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." "Every commercial agreement restrains trade" but whether the agreement "violates § 1 of the Sherman Act depends on whether

9

it is adjudged an *unreasonable* restraint." Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co., 472 U.S. 284, 289, 105 S.Ct. 2613, 2616, 86 L.Ed.2d 202 (1985) (emphasis in original) (herinafter "Pacific Stationary").

Section 1 claims are examined under either the per se test or the rule of reason test. Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1058 (8th Cir. 2000).

> Under the per se standard, conduct that is "manifestly anticompetitive" or "would always or almost always tend to restrict competition" . . . is conclusively presumed to restrain competition unreasonably "'without elaborate inquiry as to the precise harm [it has] caused or the business excuse for [its] use.'" *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 461 (3rd Cir. 1998) (*quoting Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)).

*Id.* By contrast, the rule of reason analysis

> focuses on the "particular facts disclosed by the record," *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 467, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (internal quotations and citation omitted), and "weighs all of the circumstances . . . in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition," *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

*Id.*

> Rule-of-reason analysis guides the inquiry unless the challenged action falls into the category of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."

Pacific Stationery, 472 U.S. at 289, 105 S.Ct. at 2616-17 (*quoting* Northern Pacific R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)).

The parties disagree on the standard to be applied to defendants' alleged[3] refusal to allow plaintiff to be a member of LECA and to thereby take advantage of the revenue pooling arrangement and the favorable rates charged by MCI and others.

The Supreme Court applies the per se rule where the purpose or effect of the "practice are to threaten the proper operation of our predominantly free-market economy--that is, whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, and in what portion of the market, or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.'" Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 19-20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979) (quoting United States v. United States Gypsum Co., 438 U.S. 441, 436 n. 16, 98 S.Ct. 2864, 2875 n. 16, 57 L.Ed.2d 854 (1978)). "[C]oncerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as per se violations of § 1 of the Sherman Act." Pacific Stationary, 472 U.S. at 290, 105 S.Ct. at 2617.

The Supreme Court generally applies the per se approach to cases involving "joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.'" Pacific Stationery, 472 U.S. at 294, 105 S.Ct. at 2619. "In these cases, the boycott often cuts off access to a supply, facility, or market necessary to enable the boycotted firm to compete." Id. The activities of LECA and its members could not be characterized as a group boycott because plaintiff was not prevented by LECA from selling long distance service or using MCI to carry its customers' calls. Plaintiff could, and at one time apparently did, contract with MCI for that very purpose.

Refusing membership to plaintiff may be regarded as a refusal to deal. In that sense, this case is analogous to Pacific Stationary. In that case, a wholesale purchasing cooperative

---

[3]Plaintiff claims that it was told by LECA representatives that it did not qualify for membership because it was not an LEC. However, the only recorded evidence shows that it was plaintiff's precarious financial situation, as perceived apparently correctly by defendants, which was discussed by LECA officials as a bar to membership. Defendants claim that plaintiff never formally inquired how to become a member.

association denied membership to a retail office supply store.   LECA's arrangement with MCI is similar to the activities of the wholesale purchasing cooperative in that case.  The Supreme Court noted that wholesale purchasing cooperatives "are not a form of concerted activity characteristically likely to result in predominately anticompetitive effects."  *Id.* at 295, 105 S.Ct. at 2620.

> Rather, such cooperative arrangements would seem to be "designed to increase economic efficiency and render markets more, rather than less, competitive." *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., supra,* 441 U.S., at 20, 99 S.Ct., at 1562.  The arrangement permits the participating retailers to achieve economies of scale . . . The cost savings and order-filling guarantees enable smaller retailers to reduce prices and maintain their retail stock so as to compete more effectively with larger retailers.

*Id.*

"A plaintiff seeking application of the *per se* rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects." Pacific Stationery, 472 U.S. at 298, 105 S.Ct. at 2621.  Plaintiff would be required to show that LECA "possesses market power or exclusive access to an element essential to effective competition," *Id.* at 296, 105 S.Ct. at 2620-21, in order to rely upon the per se test.  "Absent such a showing with respect to a cooperative buying arrangement, courts should apply a rule-of-reason analysis." *Id.* at 297, 105 S.Ct. at 2621.

Plaintiff admits in its response to defendants' statement of facts that there are over 50 long distance carriers providing service in South Dakota, including Sprint, MCI, AT&T, and Qwest, and there are 222 carriers authorized to do so.  Plaintiff has not presented evidence that, where LECA's members are dual service providers, they possess market power in the intrastate long distance market.  Likewise, plaintiff has not set forth facts establishing that LECA has exclusive access to an element essential to effective competition.  S&S had access to MCI, albeit at a higher rate, to carry its customers' long distance calls.  As in Pacific Stationery, because LECA does not possess market power or exclusive access to MCI's carrier lines, refusing plaintiff membership (assuming that such occurred) is not always likely to have an

anticompetitive effect.  It is therefore appropriate to apply the rule of reason to plaintiff's Section 1 claims.

To be successful in its claim that LECA's activities, or its members' conspiracy to engage in those activities, unreasonably restrains trade under the rule of reason, plaintiff must establish:

> (1) an agreement among two or more persons or distinct business entities,
> (2) which is intended to harm or unreasonably restrain competition, and
> (3) which actually causes injury to competition.

Rosebrough Monument Co. v. Memorial Park Cemetery Assoc., 666 F.2d 1120, 1138 (8th Cir. 1981).

> The primary considerations in determining whether a restraint of trade is unreasonable are whether the intent of the restraint is anticompetitive and whether the restraint itself has significant anticompetitive effects . . . Simply stated, the inquiry mandated by the rule is whether, on balance, the challenged agreement is one that "merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition."

Id. (quoting Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 49 n. 15, 97 S.Ct. 2549, 2557 n. 15, 53 L.Ed.2d 568 (1977).

Plaintiff alleges that the defendants have acted jointly to prevent plaintiff from providing intrastate long distance service in South Dakota at a fair and reasonable price because plaintiff was denied membership in LECA.  Plaintiff's complaint is that plaintiff had to pay a higher rate for the use of MCI's lines than what the LECs were paying for such service.  Plaintiff alleges that defendants have conspired to "intentionally, unlawfully, unreasonably and knowingly fix, control and raise the price of originating and terminating switched access service in South Dakota."

The fatal problem with plaintiff's case is that it has failed to show a restraint of trade. Plaintiff admitted in its response to the defendants' statement of material facts that the major long distance carriers in South Dakota are Sprint, MCI, Qwest, and AT&T.  Plaintiff also admitted that all those major competitors charged customers less for intrastate long distance service than the defendant LECs charged their customers.  Plaintiff has not shown that LECA or its individual members possessed anything close to monopoly power in the intrastate long distance market in South Dakota.  The defendant LECs charged at least $.10 per minute for intrastate long distance service.  The major carriers charged as low as $.05 per minute.  S&S even

admitted that it, at one time, charged as low as $.09 per minute. S&S alleges it could not compete with the major carriers or with the LECs because it cost S&S over $.20 per minute to carry long distance calls because it, as a long distance carrier, had to pay the various switched access tariffs. MCI, and other long distance carriers, had an agreement with Express to carry long distance calls for the LECs when the member LECs were dual service providers for their customers. MCI, we must remember, owned and operated the physical fiber optic cables to route long distance calls while the LECs did not. MCI, as the "physical" carrier of the long distance calls, paid the switched access fees.[4]

The issue here is whether the defendants' claimed refusal to admit plaintiff into their "marketing group" and therefore take advantage of MCI's more favorable charges for carrying long distance calls amounts to a restraint of trade. MCI is not a defendant so MCI's refusal (and the facts are in dispute as to whether MCI did or did not give plaintiff a more favorable rate) to give plaintiff the same rate given to defendants is not an issue. "In the absence of any purpose to create or maintain a monopoly, the Act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919).

Plaintiff must show that the defendants have or had an agreement which unreasonably harms or restrains competition. Rosebrough Monument, 666 F.2d at 1138. "It is axiomatic that the antitrust laws were passed for 'the protection of competition, not competitors.'" Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 224, 113 S.Ct. 2578, 2588-89, 125 L.Ed.2d 168 (1993) (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct.1502, 1521, 8 L.Ed.2d 510 (1962)). "'Low prices,' we have explained, 'benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not

---

[4] MCI, it would appear, was charging Express (and therefore the member LECs) less than the cost of the service for intrastate long distance traffic. One witness surmised that MCI had aggregated its intrastate and interstate costs, thus allowing it to provide Express a rate lower than the switched access tariffs that it was required to pay the LECs and SDN. Otherwise, MCI may have been engaging in predatory pricing. MCI is not a defendant in this action.

threaten competition.'" State Oil Co. v. Khan, 522 U.S. 3, 15, 118 S.Ct. 275, 282, 139 L.Ed.2d 199 (1997) (*quoting* Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 340, 110 S.Ct. 1884, 1892, 109 L.Ed.2d 333 (1990)).

Plaintiff was not prevented from delivering long distance service in South Dakota by any agreement entered into by defendants. Plaintiff was allegedly prevented from doing so at the same cost as defendants. This does not constitute a violation of the Sherman Act.

Plaintiff contends that the LECs are not charging each other the PUC imposed switched access tariffs, which allows them to offer their local exchange customers long distance service at lower rates than the rates plaintiff could afford. Defendants contend that MCI, as the "actual" long distance carrier, is billed for and pays those tariffs. Plaintiff does not dispute this contention but instead insists that the LECs are supposed to pay that tariff. Plaintiff does not point to any statute or rule requiring the LECs to pay the switched access tariffs. The undisputed testimony in the record is that the company owning the fiber optic cables which are used to transport the long distance call from the originating LEC to SDN's switch and on to the terminating LEC pays the switched access tariffs. Plaintiff has not presented any evidence that any LEC, whether or not a member of LECA, pays those tariffs.

Plaintiff offered evidence that none of the LEC defendants advertise for or provide long distance service in any other LEC's territory. An agreement not to compete in a certain market may amount to a per se violation of the Sherman Act if the agreement results in the absence of competitors in the market, thus enabling one company to eventually raise its prices. *See* Palmer v. BRG of Georgia, Inc., 498 U.S. 46, 49, 111 S.Ct. 401, 402, 112 L.Ed.2d 349 (1990). However, the plaintiff has not shown an absence of competitors, that prices were predatory, or that consumers eventually paid more for long distance service as a result of the alleged activities of the defendants.

Plaintiff has not met even its preliminary burden to show anti-trust injury. Anti-trust injury is not shown by mere harm to a competitor. Plaintiff must instead show harm to competition. Mere economic loss to plaintiff is not sufficient. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 515 U.S. 477, 488-89, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

15

To meet its initial burden of proving an antitrust violation under the rule of reason in a Section 1 claim, plaintiff must show that the alleged antitrust violation has produced anti-competitive effects within the relevant product and geographic areas. This can be done in two ways. First, a plaintiff may delineate a relevant market and show that the defendant has enough market power to significantly harm competition. Second, a plaintiff may demonstrate that the challenged practice has actually produced negative anti-competitive effects. The "purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition." FTC v. Indiana Federation of Dentists, 476 U.S. 447, 460, 106 S.Ct. 2009, 2019, 90 L.Ed.2d 445 (1986). Proof of actual detrimental effect on competition would obviate the need for inquiry into market power. Id. at 46-61, 106 S.Ct. at 2019.

Plaintiff has failed to create a genuine issue of material fact as to whether LECA or its members or both have sufficient market power to restrain trade in any relevant product or geographic market. Plaintiff has further failed to demonstrate that an exercise of market power has caused harm to competition through an increase in the price of intrastate long distance service in South Dakota.

Concord Boat directs that, in applying the rule of reason test, the court "weighs all of the circumstances . . . in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." Concord Boat, 207 F.3d at 1058. I have done so and conclude that plaintiff has not met its burden to show that genuine issues of material fact exist as to the elements plaintiff would be required to show at trial to establish a Section 1 Sherman Act claim.

## III. Conspiracy to Monopolize.

Plaintiff contends that the LECs were, at the time the complaint was filed in 2002, offering intrastate long distance service to their local telephone service customers at half the cost of providing such service. The cost of providing long distance service includes the cost of paying the required switched access tariffs, a little over \$.20 per minute in South Dakota. Plaintiff contends that such activity amounts to predatory pricing. In the alternative, plaintiff contends that defendant LECs are not charging each other the switched access tariffs, which

16

conduct was undertaken in pursuance of a conspiracy to monopolize intrastate long distance service in South Dakota.  Plaintiff contends that the foregoing violates Section 2 of the Sherman Act.

Section 2 of the Sherman Act prohibits any action to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2.  The elements of a Section 2 attempt to monopolize claim are:

> (1) a specific intent by the defendant[s] to control prices or destroy competition;
> (2) predatory or anticompetitive conduct undertaken by the defendant[s] directed to accomplishing the unlawful purpose; and
> (3) a dangerous probability of success.
> In addition, the plaintiff must prove antitrust injury "reflect[ing] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

General Industries Corp. v. The Hartz Mountain Corp., 810 F.2d 795, 801 (8th Cir. 1987).

To survive a summary judgment motion, plaintiff must show that there are genuine issues of fact as to whether defendants engaged in predatory pricing.

> Predatory pricing occurs when "a single firm, having a dominant share of the relevant market, cuts its prices in order to force competitors out of the market, or perhaps to deter potential entrants from coming in." *Morgan* [*v. Ponder*], 892 F.2d [1355] at 1358 [8th Cir. 1989] (*quoting Matsushita Elec. Indus. Co. [v. Zenith Radio Corp.]*, 475 U.S. [574] at 584 n. 8, 106 S.Ct. 1348, [89 L.Ed.2d 538 (1986)]).  Determining whether price cutting is predatory is not a simple inquiry:
>
> > The difficulty, of course, is distinguishing highly competitive pricing from predatory pricing.  A firm that cuts its prices or substantially reduces its profit margin is not necessarily engaging in predatory pricing.  It may simply be responding to new competition, or to a downturn in market demand.  Indeed, there is a real danger in mislabeling such practices as predatory, because consumers generally benefit from the low prices resulting from aggressive price competition.
>
> *Morgan*, 892 F.2d at 1358-59 (*citing Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 231 (1st Cir.1983)).

Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1061, n. 13 (8th Cir. 2000). Plaintiff has not suffered an antitrust injury unless defendants

> conspired to drive [plaintiff] out of the relevant markets by (i) pricing below the level necessary to sell their products, or (ii) pricing below some appropriate measure of cost. An agreement without these features would either leave [plaintiff] in the same position as would market forces or would actually benefit [plaintiff] by raising market prices. [Plaintiff] therefore may not complain of conspiracies that, for example, set maximum prices above market levels, or that set minimum prices at any level.

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 n. 8, 106 S.Ct. 1348, 1355 n. 8, 89 L.Ed.2d 538 (1986).

In order to show predatory pricing, plaintiff must establish that there is a genuine issue of material fact as to whether it cost the defendant LECs more than $.10 per minute to provide intrastate long distance service to their customers. Plaintiff has failed to establish that the defendant LECs were paying MCI and the other carriers more than $.10 per minute for carrying their long distance calls. On the contrary, plaintiff submitted (Exhibit 29 to Doc. 153) a record showing that, as of August 28, 2000, MCI's proposed rate to Express for carrying its members originating and terminating intrastate long distance service totaled less than $.10 per minute. Plaintiff has failed to establish therefore that the $.10 per minute charge the defendant LECs are alleged to have charged their customers for intrastate long distance was predatory, that is, below cost.

Contrary to plaintiff's allegations, the individual LEC defendants did not have to pay the switched access tariffs because the individual LECs did not actually connect the call to SDN or to the terminating LEC. MCI did that. MCI was, for all physical purposes, the actual intrastate long distance carrier for the LECs' customers' long distance calls when the LEC was the customer's dual service provider. MCI was billed for and paid the switched access tariffs when it carried those calls. How could MCI pay over $.20 per minute in switched access tariffs (originating, equal access, and terminating) and still offer to the individual LECs a rate of $.10 per minute for the use of its lines? MCI may have been charging the LECs a predatory price to carry their customers' intrastate long distance calls as part of its agreement with LECA. MCI, as

noted previously, is not a party to this action and the court is not concerned in this suit with whether MCI engaged in predatory pricing of the services provided to the LECs.

Even if plaintiff could establish that the prices LECA's members charge their customers for intrastate long distance service was predatory, plaintiff would have to show that genuine issues of material fact exist as to the anti-competitive effect or competitive injury of the predatory prices.

> To establish competitive injury for a predatory pricing claim under § 2 of the Sherman Act, 15 U.S.C. § 2, plaintiff must prove "that the prices complained of are below an appropriate measure of its rival's costs," and "that the competitor had . . . a dangerous probability of recouping its investment in below-cost prices." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-24, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993).

National Parcel Services, Inc. v. J.B. Hunt Logistics, Inc., 150 F.3d 970, 971 (8th Cir. 1998).

"Anticompetitive conduct is conduct without legitimate business purpose that makes sense only because it eliminates competition." General Industries Corp. v. The Hartz Mountain Corp., 810 F.2d at 804. In order to prove a Section 2 claim, plaintiff must show that defendants possess "sufficient power to come dangerously close to achieving monopoly power." *Id.* Plaintiff must demonstrate the relevant geographic and product markets in order to measure defendants' ability to lessen or destroy competition. *Id.*

> Market definition is not a jurisdictional prerequisite, or an issue having its own significance under the statute; it is merely an aid for determining whether power exists. Determination of relevant product market is a fact question for which the burden of proof rests on the plaintiff.

General Industries Corp. v. The Hartz Mountain Corp., 810 F.2d at 805 (internal citations omitted).

> Defining a relevant product market is primarily "a process of describing those groups of producers which, because of the similarity of their products, have the ability – actual or potential – to take significant amounts of business away from each other."

*Id.* (citation omitted). Determination of "the relevant product market is a factual issue which is reserved to the jury." *Id.*

Defendants contend that plaintiff's Section 2 claim must fail because plaintiff has no admissible expert testimony establishing the relevant product market or market share. However, expert testimony is not always necessary to prove market or market share. *See* General Industries Corp. v. The Hartz Mountain Corp., 810 F.2d at 806. It is clear that the relevant product market is the intrastate long distance territory covered by LECA's 27 member LECs. Market share can be shown by documented statistical evidence or observations made by persons familiar with the market. *Id.* In any event, I have already denied the defendants' motion to strike any testimony of plaintiff's expert.

"The second prerequisite to holding a competitor liable under the antitrust laws for charging low prices is a demonstration that the competitor had a reasonable prospect, or, under § 2 of the Sherman Act, a dangerous probability, of recouping its investment in below-cost prices." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 224, 113 S.Ct. 2578, 2588, 125 L.Ed.2d 168 (1993). "For the investment to be rational, the [predator] must have a reasonable expectation of recovering, in the form of later monopoly profits, more than the losses suffered." *Id.* (*quoting* Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 588-89, 106 S.Ct. 1348, 1356-57, 89 L.Ed.2d 538 (1986)).

> Recoupment is the ultimate object of an unlawful predatory pricing scheme; it is the means by which a predator profits from predation. Without it, predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced. Although unsuccessful predatory pricing may encourage some inefficient substitution toward the product being sold at less than its cost, unsuccessful predation is in general a boon to consumers.

Brooke, 509 U.S. at 224, 113 S.Ct. at 2588.

Plaintiff would be required at trial to establish that LECA and its members had a reasonable prospect or dangerous probability of recouping profits they lost when they were charging their customers less than the cost of providing intrastate long distance service. Plaintiff must make a showing establishing the existence of this element in order to survive summary judgment. Celotex v. Catrett, 477 U.S. at 322-23, 106 S. Ct. 2552.

Plaintiff contends in its statement of undisputed material facts that defendant LECs possessed over 38% of the intrastate long distance market in 2001. Plaintiff cites Exhibits 45 and

20

50 in support of this contention. Exhibit 45 shows that Express handled less than 1% of the total intrastate long distance minutes shown on that exhibit. Exhibit 50 contains deposition testimony that Express handled 20% and no more than 30% of the intrastate long distance traffic in 2001. These numbers are in contrast to Worldcom's 42% share, AT&T's 24% share, and MCI's[5] 16% share in 2001. Plaintiff has not met its burden to show that, based upon its market share, Express had a reasonable prospect of recouping any alleged lost profits as a result of its predatory pricing.

Regardless of the relative market share possessed by Express and its member LECs in 2001, plaintiff has not even alleged, much less shown, what Express' market share has become as a result of plaintiff's withdrawal (as a result of not being able to compete with Express' predatory prices) from the market. Although I am not required to do so, I have scoured the record in an attempt to find some credible evidence to support plaintiff's burden to establish the element of recoupment. See Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1085 (8th Cir. 1999): "[A] district court is not 'obligated to wade through and search the entire record for some specific facts which might support the nonmoving party's claim.'" (internal citation omitted); Ragas v. Tenn. Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998) ("'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'" (internal citation omitted); c.f. United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs"). Plaintiff has not established dangerous probability, much less reasonable possibility, that any alleged predatory prices could be recouped as a result of monopoly power obtained through predatory pricing.

## CONCLUSION

Under federal law, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex v. Catrett, 477 U.S. at 327, 106 S.Ct. at 2555. Summary judgment is appropriate in this matter because plaintiff has failed to show genuine issues of material fact exist as to elements essential to plaintiff's Sherman Act claims.

---

[5]Sometime after 2001, MCI and Worldcom became MCI Worldcom.

21

**ORDER**

Now, therefore,

IT IS ORDERED that defendants' motion (Doc. 144) for summary judgment is granted.

This matter is dismissed with prejudice and without the taxation of costs.

Dated this 28th day of February, 2006.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY _____ DEPUTY
(SEAL)

22